UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

_____

REBECCA FLORENCE VIRNIG,

                        **Plaintiff,**

  vs.                                                   5:22-CV-775
                                                         (MAD/ATB)

UNITED STATES OF AMERICA,

                        **Defendant.**

_____

**APPEARANCES:**                                           **OF COUNSEL:**

**REBECCA FLORENCE VIRNIG**
1006 Bakers Row
Blackstone, Virginia 23824
Plaintiff *pro se*

**OFFICE OF THE UNITED**                   **EMER M. STACK, AUSA**
**STATES ATTORNEY**
100 S. Clinton Street
Suite 9000
Syracuse, New York 13261
Attorneys for the United States

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

       On January 31, 2022, Plaintiff filed a *pro se* complaint in the United States District Court for the Eastern District of Virginia seeking redress under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671 *et seq.*, for an injury she sustained while participating in a military training exercise at Fort Drum, New York. *See* Dkt. No. 1. On July 22, 2022, the case was transferred to this Court. *See* Dkt. No. 23. On September 19, 2022, Plaintiff filed an amended complaint. *See* Dkt. No. 32.

Currently before the Court is the Government's motion to dismiss the amended complaint pursuant to Rule 12(b)(1) and Rule 12(b)(6) or, in the alternative, for summary judgment pursuant to Rule 56. *See* Dkt. No. 35.

## II. BACKGROUND

**A.     Battlefield Simulations at Fort Drum**

As part of the comprehensive training program that the United States uses to prepare military members for active warfare, the United States Army simulates battlefield hostilities, typically on military bases across the country. *See* Dkt. No. 35-1 at ¶ 1. The focus of these simulation exercises is to recreate, as much as possible, the actual conditions under which military members will fight should they ever be called to battle. *See id.* at ¶ 2. As stated in the relevant Army regulation: "Military exercises simulate wartime operations. Their realistic, battle-focused setting helps train battlefield commanders, staffs, and units for combat. The realistic setting also helps train support commanders, staffs, installations, and units in mobilizing, deploying, and sustaining operational forces." *Id.*; *see also Army Reg.* 350-28, § 2-1(a).

One of these simulation programs is operated by the United States Army National Guard ("ARNG") and is known as the "Exportable Combat Training Capability" ("XCTC") Program, which "enables" ARNG "Brigade Combat Teams ... to achieve trained Platoon readiness" in preparation for rotations at the Army's Combat Training Centers at Fort Irwin, California and Fort Polk, Louisiana. *See* Dkt. No. 35-3 at ¶ 5 (quoting *Army National Guard Reg.* 350-50-1, §§ 1-1(a) and 2-2(b)). XCTC is an Army National Guard Training Program, meaning that it is operated at the federal level by ARNG personnel who coordinate with State National Guard headquarters "based on [ARNG] training requirements generated by [ARNG] Readiness and Plans." *Id.* (quotation omitted).

2

ARNG held an XCTC simulated battlefield exercise between May and June 2018, at Fort Drum, which is located near Watertown, New York. *See* Dkt. No. 35-2 at ¶ 5. ARNG contracted with private entities to provide support in conducting this training exercise, including in the use of special effects that would simulate detonations and analogous battlefield explosions. *See id.* at ¶ 6. The prime contract for these services was between the United States Army and Raytheon Company. *See id.* at ¶ 7. As relevant to this lawsuit, Raytheon entered into a subcontract with Ravenwood Solutions, which further subcontracted with Westefx Military Services – a company that "provides a state-of the-art experience that ensures our soldiers train in as close to real-world combat scenarios as possible" – to provide simulated explosives for the Fort Drum XCTC exercise. *See id.* at ¶ 8. At all times, this contracted support – such as that provided by Westefx – was subordinate to the ARNG XCTC Program Manager, who "'[p]rovide[d] guidelines to the contracted support agencies on matters related to doctrine, realistic conditions for training, objective standards for operation and maintenance of instrumentation, and tactics, techniques, and procedures.'" Dkt. No. 35-3 at ¶ 9 (quoting *Army National Guard Reg.* 350-50-1, § 2-3(b)). Although contractors were hired to facilitate the execution of this XCTC rotation, the Government contends that their employees who worked directly with the exercising soldiers within the training area were supervised by military members who "[c]oordinate[d]/direct[ed]" them. *Id.* at ¶ 10 (quoting *Army National Guard Reg.* 350-50-1, § 3-8(a)(1)).

Westefx employed Plaintiff to serve in the role of Battlefield Effects ("BFE") Technician, responsible for detonating simulated explosives during the Fort Drum XCTC exercise on June 7, 2018. *See* Dkt. No. 35-2 at ¶ 11. Prior to arriving at Fort Drum for the exercise, Plaintiff executed a personal contract in which she acknowledged that she would be engaged in activities on a federal military base, and that she had to abide by the strict conduct policy of the United

3

States Department of Defense. *See id.* at ¶ 12 (citing Dkt. Nos. 35-6 & 35-7). Plaintiff further warranted that she understood that if she engaged in certain prohibited activities during the exercise, she would be turned over to the military police. *See id.* at ¶ 13.

**B.     The Events of June 7, 2018**

Individuals who were part of the XCTC exercise on June 7, 2018, were assigned to various parts of the simulated "battlefield," which were known as "lanes." Dkt. No. 35-2 at ¶ 14. A military member – known colloquially as an "Operator/Controller" ("OC") or "Observer Coach/Trainer" ("OC/T") – is assigned to each "lane," and is responsible for all personnel participating in the exercise in that particular lane. *See id.* at ¶ 15. The OC is the sole person responsible for directing and maintaining control over all personnel – whether civilian or military, government employee or contractor – during the exercise, including whether to place those individuals and their equipment, and what actions to take and when. *See id.* at ¶ 16. According to the Government, when the OC of a particular lane gives an instruction, a Westefx employee assigned to that lane must obey that command as would any military member in an actual battlefield context. *See id.* The supervisory control of the OC within the lane is set forth in ANRG regulations as follows: "'Lane OC/Ts ... [c]oordinate/direct the ... OPFOR [opposing forces], COBs [civilians on the battlefield], Role Players, BFE, and videographers.'" Dkt. No. 35-3 at ¶ 17 (quoting *Army National Guard Reg.* 350-50-1, § 3-8(a)(1)).

On June 7, 2018, Plaintiff was assigned to Platoon Attack Lane 5. *See* Dkt. No. 35-2 at ¶ 18. Also assigned to Platoon Attack Lane 5 was an assistant BFE from Westefx, Mary Thompson. *See id.* at ¶ 19. The OC on Platoon Attack Lane 5 that day was then-Specialist Matthew Hodolitz. *See id.* at ¶ 20.

4

Before the beginning of the exercise on June 7, 2018, and before even traveling out to Platoon Attack Lane 5, Plaintiff showed the "ammunition" that she and Thompson had gathered for the exercise to Specialist Hodolitz. *See id.* at ¶ 22. When she arrived at Platoon Attack Lane 5, Specialist Hodolitz brought Plaintiff and Thompson into the wooded area on that "lane" and instructed them to place the devices that they were carrying for detonation during the exercise to certain locations. *See id.* at ¶ 23. Specialist Hodolitz also ordered Plaintiff not to "fire" her devices until he gave her a direction to do so – an order that Plaintiff complied with. *See id.* at ¶¶ 24-25.

During the conduct of the exercise, when a particular group of soldiers arrived on the lane, they signaled one of their maneuvers by setting off a parachute flare.[1] *See id.* at ¶ 26. Plaintiff alleges that this parachute flare came to rest near her position, and subjected her to a bright light. *See id.* (citations omitted). After this occurred, Plaintiff did not attempt to contact anyone connected to Westefx; rather, through her handheld radio, she contacted Specialist Hodolitz as her lane commander. *See id.* at ¶ 27. Specialist Hodolitz "came straight to" Plaintiff after hearing her communication, immediately removed the flare from her field of vision, and arranged for some of the soldiers to assist Plaintiff in getting out of the woods and off the training lane. *See id.* at ¶ 28. Plaintiff was then examined by a military medic, who explained that she likely had experienced a mini-concussion and should be seen by other medical personnel if she was still experiencing symptoms two-to-three days later. *See id.* at ¶ 29.

**C.    Plaintiff's Workers' Compensation Benefits**

---

[1] A "parachute flare" consists of "a small parachute with an illuminating flare connected to it so as the flare burns it is slowly dropped to the ground," which is "used to illuminate areas at night or in low light." Dkt. No. 35-2 at ¶ 26 n.2.

5

On July 13, 2018, Plaintiff applied for workers' compensation benefits through the policy maintained by Westefx. *See* Dkt. No. 35-2 at ¶ 30. Plaintiff's application for workers' compensation benefits was approved, and Plaintiff has received workers' compensation benefits as a result of the incident that occurred during the XCTC training exercise at Fort Drum. *See id.* at ¶ 31.

**D.     Administrative Proceedings**

On June 4, 2020, Plaintiff submitted an administrative claim to the United States Department of the Army, seeking $5,000,000 in monetary relief under the FTCA for the incident that occurred during the XCTC training exercise at Fort Drum. *See id.* at ¶ 32. After completing an investigation of the incident, on or about July 21, 2021, the Army denied Plaintiff's administrative claim through a letter. *See id.* at ¶ 33. In that letter, the Army articulated first that Plaintiff was barred from seeking recovery in tort against the United States because, under New York law, workers' compensation was her exclusive remedy. *See id.* This was so, the Army explained, because the "Army had supervisory control over [Plaintiff's] actions and ultimate work outcome while on the training battlefield." *Id.* The Army also explained that its investigation into the incident revealed no evidence of any negligent conduct that would allow the United States to be held liable under the provisions of the FTCA. *See id.*; *see also* Dkt. No. 1-1 at 8-9.

On November 21, 2021, Plaintiff sought reconsideration from the Army of its denial of her FTCA administrative claim. *See id.* at ¶ 34. In her request for reconsideration, Plaintiff did not challenge the Army's conclusion that it had control over her actions during the training exercise (and thus workers' compensation remained her exclusive remedy); rather, she challenged only the conclusion that there had been no negligence, maintaining that the Army should not have used its own pyrotechnic devices during its own training exercise. *See id.*

Plaintiff filed the instant civil action on January 31, 2022, before the Army took action on Plaintiff's request for reconsideration. *See id.* at ¶ 36. Since the commencement of this lawsuit, the Army has formally denied the request for reconsideration, noting Plaintiff's decision to seek relief for the same incident in this Court. *See id.* at ¶ 37.

**E.     Proceedings in Federal Court**

As noted, Plaintiff filed the instant civil action in the Eastern District of Virginia. *See* Dkt. No. 1. On May 17, 2022, then-defendants National Guard Bureau and General Daniel R. Hokanson moved to dismiss the complaint, or alternatively, for transfer of venue or summary judgment. *See* Dkt. Nos. 12 & 13. The Eastern District of Virginia dismissed those two defendants, added the United States as a defendant, and transferred venue to the Northern District of New York without addressing any of the merits-based arguments for dismissal. *See* Dkt. No. 23 at 6 n.5.

On September 19, 2022, Plaintiff filed an amended complaint and the Government has now moved for dismissal of this action, raising primarily the same arguments raised in the Eastern District of Virginia. *See* Dkt. No. 35. Specifically, the Government contends that Plaintiff's FTCA claim is barred by the exclusivity of workers' compensation benefits as the remedy for her alleged workplace injuries. *See* Dkt. No. 35-1 at 11-18. The Government argues that since it was Plaintiff's "special employer" at the time of her injury, it would be immune from a tort suit under New York's Workers' Compensation Law if it were a private employer. *See id.* Since the Government has consented to be sued in tort under the FTCA only when an analogous private person could be sued under state law, the Government contends that the Court lacks subject-matter jurisdiction over this case. *See id.* In response, Plaintiff appears to argue that she never

7

consented to being in a "special employee" relationship with the Government. *See* Dkt. No. 41 at 5-7.

### III. DISCUSSION

**A.     Standards**

*1. Motion to Dismiss for Lack of Subject-Matter Jurisdiction*

"A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that the court retains jurisdiction." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). "When considering a motion to dismiss for lack of subject matter jurisdiction or for failure to state a cause of action, a court must accept as true all material factual allegations in the complaint." *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998). "[T]he district court can refer to evidence outside the pleadings and the plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Luckett v. Bure*, 290 F.3d 493, 496-97 (2d Cir. 2002). "Indeed, a challenge to the jurisdictional elements of a plaintiff's claim allows the Court to weigh the evidence and satisfy itself as to the existence of its power to hear the case." *Celestine v. Mt. Vernon Neighborhood Health Ctr.*, 289 F. Supp. 2d 392, 399 (S.D.N.Y. 2003), *aff'd*, 249 Fed. Appx. 851 (2d Cir. 2007). "'The court may consider affidavits and other materials beyond the pleadings but cannot rely on conclusory or hearsay statements contained in the affidavits.'" *Zeranti v. United States*, 358 F. Supp. 3d 244, 252 (W.D.N.Y. 2019) (quotation omitted).

*2. Motion for Summary Judgment*

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43

8

F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "'cannot try issues of fact; it can only determine whether there are issues to be tried.'" *Id.* at 36-37 (quotation and other citation omitted). Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 258 (1986). In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson*, 477 U.S. at 255) (other citations omitted). Irrelevant or unnecessary facts do not preclude summary judgment, even when they are in dispute. *See Anderson*, 477 U.S. at 258.

The moving party bears the initial burden of establishing that there is no genuine issue of material fact to be decided. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). With respect to any issue on which the moving party does not bear the burden of proof, it may meet its burden on summary judgment by showing that there is an absence of evidence to support the nonmoving party's case. *See id.* at 325. Once the movant meets this initial burden, the nonmoving party must demonstrate that there is a genuine unresolved issue for trial. *See* Fed. R. Civ. P. 56(e). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### 3. Pro Se Submissions

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.'" *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has held that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a

legal education. *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment." *Kotler v. Fischer*, No. 9:09-CV-01443, 2012 WL 929823, *12 (N.D.N.Y. Mar. 19, 2012) (citations omitted). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Cary v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

**B.     The FTCA Claim is Barred by the Exclusivity of Workers' Compensation Benefits**

It is well settled that "[t]he United States, as sovereign, is immune from suit save as it consents to be sued ..., and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *United States v. Mitchell*, 445 U.S. 535, 538 (1980); *see also Dotson v. Griesa*, 398 F.3d 156, 177 (2d Cir. 2005). The FTCA provides a limited waiver of sovereign immunity for certain types of tort claims. *See Celestine v. Mt. Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 80 (2d Cir. 2005). The statute grants federal courts exclusive jurisdiction over suits against the United States for "personal injury ... caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment[.]" 28 U.S.C. § 1346(b)(1). However, that waiver of immunity applies only "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Id.*

Consistent with Section 1346(b)(1), a court considering an FTCA claim is bound to apply the law of the state where the accident occurred. *See Makarova*, 201 F.3d at 114. Here, Plaintiff's alleged injury occurred in New York. As such, subject-matter jurisdiction exists only if Plaintiff could have sued a private defendant in New York under the facts of this case.

10

In the pending motion, the Government argues that, although Westefx was generally responsible for paying Plaintiff's wages with respect to her work as a BFE technician during the XCTC training simulation, and for maintaining workers' compensation coverage for her work, Plaintiff was in the special employ of the United States and, therefore, it would be immune from a tort suit under New York's Workers' Compensation Law if it were a private employer. *See* Dkt. No. 35-1 at 13-17. The Government observes that the United States has consented to be sued in tort only when an analogous private person could be sued under state law. *See id.* So, under the familiar principle that the United States may only be sued with its consent, the Government argues that the Court lacks subject-matter jurisdiction over this case. *See id.*

The law of workers' compensation is the product of a bargain between employers and their employees. Employees receive moderate but certain payments to compensate for their injuries, regardless of fault, but give up the potential of larger tort claims against their employers; employers give up the defenses available to them at common law, but need not face judgments beyond their capacity to insure; and both sides avoid the costs of litigation. *See* Martin Minkowitz, *New York Workers' Compensation* § 1:8, 27 N.Y. Practice (2d ed. 2011). In New York, this bargain is embodied in Section 11 of the Workers' Compensation Law: "The liability of an employer prescribed by [section 10] shall be exclusive and in place of any other liability whatsoever, to such employee [or various privies], on account of ... injury or death...."

New York's Workers' Compensation Law does not define "employer," but the New York Court of Appeals "ha[s] consistently found as a general proposition that a general employee of one employer may also be in the special employ of another, notwithstanding the general employer's responsibility for payment of wages and for maintaining workers' compensation and other employee benefits." *Thompson v. Grumman Aerospace Corp.*, 78 N.Y.2d 553, 557 (1991)

11

(citations omitted). "A special employee is described as one who is transferred for a limited time of whatever duration to the service of another." *Id.* (citation omitted). As the Court of Appeals has noted, "[t]hese cases usually involve arrangements under which a general employer performed work and provided services for another business and, in the course of doing so, an employee and equipment of the general employer were necessarily used and temporarily assigned to work for that business." *Id.*

Whether a special employment relationship exists can be decided by the court as a matter of law "where the particular, undisputed critical facts compel that conclusion and present no triable issue of fact." *Id.* at 557-58. "Many factors are weighed in deciding whether a special employment relationship exists, and generally no one is decisive." *Id.* (citation omitted). "While not determinative, a significant and weighty feature has emerged that focuses on who controls and directs the manner, details and ultimate result of the employee's work." *Id.* at 558 (citations omitted). Courts must also consider "whether the plaintiff was aware of and consented to a special employment relationship." *Bernier v. Gabriel Contracting*, 6 A.D.3d 369, 371 (2d Dep't 2004) (citations omitted); *see also Zupan v. Irwin Contracting, Inc.*, 145 A.D.3d 715, 718 (2d Dep't 2016) (holding that "the employee must have had knowledge of, and consented to, the special employment relationship") (citations omitted). "The receipt of Workers' Compensation benefits from a general employer precludes an employee from commencing a negligence action against a special employer." *Pena v. Automatic Data Processing, Inc.*, 105 A.D.3d 924, 924 (2d Dep't 2013) (citations omitted).

In the present matter, the Court finds that the undisputed facts establish that the United States became Plaintiff's special employer during the XCTC training exercise on June 7, 2018. The United States Army, through Specialist Hodolitz, had the authority to (and actually did)

direct and control all aspects of Plaintiff's work as a battlefield technician during the XCTC training exercise. *See Army National Guard Reg.* 350-50-1, § 3-8(a)(1) ("Lane OC/Ts ... [c]oordinate/direct the ... OPFOR [opposing forces], COBs [civilians on the battlefield], Role Players, BFE, and videographers"). In fact, as Specialist Hodolitz stated in his declaration, he "was the sole person responsible for giving directions to and maintaining control of the personnel on [Platoon Attack Lane 5] during the training exercise." Dkt. No. 35-14 at ¶ 3.

Consistent with this control, Specialist Hodolitz instructed Plaintiff to place her simulated explosives in a location of his choosing, (based on his assessment of the Army's training scenario), and "to fire only when [he] gave her direction." *Id.* Plaintiff's amended complaint and response to the Government's motion does nothing to refute this assessment of Specialist Hodolitz's control. Indeed, Plaintiff alleges that, upon her arrival at the training lane, she approached Specialist Hodolitz to obtain direction on where to place her simulated explosives, and that she detonated those explosives only consistent with Specialist Hodolitz's orders. *See* Dkt. No. 32 at 5-6. Moreover, when Plaintiff was injured by the flare, she did not call anyone within Westefx for assistance; instead, she called her immediate battlefield supervisor, Specialist Hodolitz, who immediately responded to her call. *See id.* at 8. Additionally, Plaintiff acknowledged in her contract with Westefx that the United States Army had the right to remove her from Fort Drum should it conclude that she engaged in certain prohibited conduct. *See* Dkt. Nos. 35-6 & 35-7.

In her response, Plaintiff argues that her consent was required for a special employment relationship to exist and that she was never made aware of such a relationship. *See* Dkt. No. 41 at 7. It is true that "some cases hold that an employee may be treated as a special employee only if she knew of and approved of the arrangement with the new employer." *Porter v. United States*,

13

No. 13-cv-7332, 2015 WL 1004953, *4 (S.D.N.Y. Mar. 3, 2015). However, even in those cases courts acknowledge that "[k]nowledge and approval may be inferred where the servant, continuing in the service, takes his orders from someone other than the hirer or the hirer's representative." *Id.* (quoting *Murray v. Union Ry. Co. of New York City*, 229 N.Y. 110, 113 (1920)). Here, Plaintiff's knowledge and approval may be inferred in that way: the undisputed facts demonstrate that she took orders from someone other than Westefx – then-Specialist Hodolitz.

The undisputed facts also establish that Plaintiff applied for and has received workers' compensation benefits through a policy held by Westefx. Although Plaintiff's response indicates that she has encountered some issues in receiving payment for various medical expenses from the insurer, she does not dispute that she was awarded such benefits. Based on these facts, the Court finds that the Government has met its burden of establishing that a special employment relationship existed between the United States and Plaintiff.

The facts of Plaintiff's case are nearly identical to those present in *Al-Khazraji v. United States*, 519 Fed. Appx. 711 (2d Cir. 2013), a case in which – although arising under New Jersey workers' compensation law[2] – the Second Circuit upheld the district court's decision to dismiss for lack of subject matter jurisdiction, reasoning that a special employment relationship existed between the United States and an FTCA plaintiff for purposes of workers' compensation exclusivity. As here, the plaintiff in *Al-Khazraji* was generally employed by a contracting entity (known as "Goldbelt") to provide assistance to the United States Army during a battlefield

---

[2] New York and New Jersey law overlap substantially on the issue of when a special employment relationship is created for purposes of workers' compensation exclusivity. *See, e.g.*, *Volb v. G.E. Capital Corp.*, 651 A.2d 1002, 1005 (N.J. 1995) (holding that "the most important factor in determining a special employee's status is whether the borrowing employer had the right to control the special employee's work").

simulation training exercise (held a Fort Dix) as a "Civilian on the Battlefield," and alleged that he was injured by a simulated hand grenade that exploded during the exercise near his location. *See Al-Khazraji v. United States*, No. 09-cv-521, 2012 WL 638999, *1 (W.D.N.Y. Feb. 27, 2012). As with the protocol during the Fort Drum XCTC exercises, the exercises at issue in *Al-Khazraji* consisted of a series of "training lanes" which were "supervised by military personnel" known colloquially as "observer controllers" who "directed the role players as to what to do." *Id.* at *4. For this reason, among other things, the district court concluded that "although plaintiff was hired by Goldbelt and Goldbelt supervisors were present at Fort Dix, 'the right to direct the on-site work assignments and to control that work lay with'" the United States, and the plaintiff was thus precluded from seeking tort liability. *See id.* (quotation omitted). On appeal, the Second Circuit affirmed the district court, given the evidence in the record that the United States had the right to control the details of the plaintiff's work and was, therefore, a special employer of the plaintiff. *See Al-Khazraji*, 519 Fed. Appx. at 714.

      Here, as in *Al-Khazraji*, the Court finds that the United States was Plaintiff's "special employer" within the meaning of New York's Workers' Compensation law. In sum, the undisputed facts establish that (1) Plaintiff implicitly consented to an employment contact with Defendant; (2) Plaintiff, by participating in the military training scenarios, was essentially performing the work of the Government; (3) the Government had the right to control the details of Plaintiff's work; and (4) the Government's authority to preclude Plaintiff from Fort Drum constitutes the ability to discharge him. This Court therefore concludes that Plaintiff was a special employee of the Government for purposes of New York's workers' compensation scheme, and as such, Plaintiff is precluded from maintaining the present tort action against the Government. *See Ferguson v. National Gypsum Servs. Co.*, 169 A.D.3d 1355, 1355-56 (4th Dep't

15

2019) (finding that the plaintiff was the special employee of the defendant where, although his wages and workers' compensation benefits were provided by a non-party staffing agency, the defendant exercised "'complete and exclusive control over the manner, details and ultimate results of plaintiff's work,'" the staffing agency was not present at the job site and had no right to direct, supervise or control the plaintiff's work, the defendant provided the plaintiff with the requisite training to perform his job, and the defendant had the authority to fire the plaintiff with respect to his employment at its job site) (quotation and other citations omitted); *Flanagan v. Kajima USA, Inc.*, 163 A.D.3d 775, 776 (2d Dep't 2018) (same); *Cipollone v. Aramark Healthcare Support Servs., LLC*, No. 10-cv-175, 2012 WL 683578, *4-8 (E.D.N.Y. Mar. 2, 2012) (same). Because the Government cannot be held liable in accordance with the law of the place where the act or omission occurred, this Court lacks subject-matter jurisdiction over this case. *See* 28 U.S.C. § 1346; *see also Al-Khazraji*, 519 Fed. Appx. at 714; *Makarova v. United States*, 201 F.3d 110, 116 (2d Cir. 2000).

Accordingly, the Court finds that it lacks subject-matter jurisdiction over this action and grants the Government's motion.

### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the reasons set forth above, the Court hereby

**ORDERS** that the Government's motion to dismiss the amended complaint pursuant to Rule 12(b)(1) and Rule 12(b)(6) or, in the alternative, for summary judgment pursuant to Rule 56 (Dkt. No. 35) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in the Government's favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: June 30, 2023
      Albany, New York

*/s/ Mae A. D'Agostino*
Mae A. D'Agostino
U.S. District Judge